**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 0 2 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
Maricela Mira,

                            Plaintiff,

        —against—

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                            Defendant,
--------------------------------------------------------x

**MEMORANDUM AND ORDER**

09-CV-2012 (SLT)

**TOWNES, United States District Judge:**

Plaintiff Maricela Mira ("Plaintiff") brings this action under 42 U.S.C. Sec. 405(g) and

1383(c)(3), seeking review of a final decision of Defendant Michael J. Astrue, Commissioner of

Social Security ("the Commissioner"), which held that Plaintiff was not disabled under sections

216(i) and 223(d) of the Social Security Act, as amended ("the Act") and was, therefore,

ineligible for Disability Insurance Benefits ("DIB"). Plaintiff and the Commissioner now cross-

move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth

below, both motions are denied, and the Court remands this case for further proceedings

consistent with this Memorandum and Order.

## *BACKGROUND*

### *Plaintiff's Education and Work History*

Plaintiff was born in 1963 in Equador (48, 391)[1]. On plaintiff's alleged onset date of

August 12, 2002, plaintiff was 39 years old, and on her date of last insured (December 31, 2006),

she was 43 years old (18). Plaintiff has a high school education plus some college and is able to

---

[1] Numbers in parentheses denote pages in the Administrative Record.

communicate in English (388-517). She has past relevant work experience as an insurance sales agent, customer service representative, and financial teller (31, 391, 521).

***Procedural History***

On November 12, 2002, Plaintiff filed her application for benefits, alleging disability commencing on August 12, 2002 based on lower back, right and left knee, and neck pain (48-51). On April 29, 2003, her application was denied (33, 312-15). Subsequently, plaintiff filed a timely request for a hearing before an administrative law judge ("ALJ") (316). On January 26, 2005, Plaintiff, represented by counsel, appeared and testified at a hearing before ALJ Seymour Fier (37). On May 11, 2005, ALJ Fier issued a decision finding that plaintiff was not disabled because she retained the residual functional capacity to perform her past relevant work (34-43). Plaintiff requested a review of the hearing decision, and on November 8, 2005, the Appeals Council remanded the case for further proceedings (45-47). On February 14, 2006, Plaintiff, represented by counsel, appeared and testified before ALJ Fier (518-579). ALJ Fier considered Plaintiff's claim de novo, and on May 24, 2006, issued a decision finding that plaintiff was not disabled (346-55). Plaintiff then filed a timely request for review with the Appeals Council (356). On August 4, 2006, the Appeals Council granted the request and remanded for further proceedings before a different ALJ (358-61).

On December 13, 2007, plaintiff, represented by counsel, appeared and testified at a hearing before ALJ Hazel Strauss (388-517). Also testifying at the hearing were Dr. Fleischer, Plaintiff's treating physician, Dr. Donald I. Goldman, an orthopedist, Dr. Warren Elliot Cohen, a neurologist, and Melissa J. Fass-Karlin, a vocational expert ("VE") (*Id.*). ALJ Strauss considered plaintiff's claim de novo, and on July 24, 2008, issued a decision finding that plaintiff was not disabled from August 12, 2002 to December 31, 2006, the date last insured,

2

because she was able to perform her past relevant work (14-32). Plaintiff requested review of

ALJ Strauss's decision, and on April 15, 2009, the Appeals Council denied plaintiff's request.

Plaintiff filed this action on May 12, 2009.

### Plaintiff's Testimony Regarding Her Past Work and Injury

During the hearing conducted on December 13, 2007, Plaintiff indicated that in her

capacity as a customer service representative at both Washington Mutual and Dime Savings

Bank, she did some walking, standing, and sitting, but that she did no lifting (478-84). Plaintiff

testified that while working as a bank teller at Lincoln Savings Bank, she mainly stood and that

she would carry approximately twenty pounds (486). In that capacity, the majority of her tasks

included handling money, taking checks for deposit, as well as selling bonds and travelers'

checks. While working as a customer service representative for life insurance sales, plaintiff

would sit and talk to customers about their needs and attempt to find them an appropriate

insurance policy (478-80).

Plaintiff further testified at the December 13, 2007 hearing that prior to the relevant

period, in March 2000, plaintiff was involved in a motor vehicle accident resulting in injury to

her neck, lower back, left shoulder, and left knee (97, 113, 396). On June 23, 2000, Dr. Ronald

Krinick, an orthopedist, operated on plaintiff's left knee to repair a torn medial meniscus,

traumatic arthropathy, and partial anterior cruciate ligament tear (122-25, 153-55). Plaintiff also

testified at the hearing that on May 3, 2002, she tripped on a carpet and landed on her right knee

(487). Two hours after the accident, she felt as though she had a fever and was experiencing

headaches, dizziness, and pain in her lower back, right leg, and knee, injury to her shoulders and

numbness of the whole leg (488). Pain radiated into her upper back affecting her neck and

3

causing headaches (488). Plaintiff underwent surgery in October 2002 on her right knee to repair a torn meniscus (259, 400-01).

Plaintiff was unable to remember the names of her pain medications except for Vioxx, Celebrex, Methadone, and Motrin (489-90). From August 2002 to December 2006, she drove once or twice per week and spent her time lying around or going to physical therapy (476-77, 496). She stated that she could walk for five to ten minutes at a time and could stand for twenty minutes before her back started hurting (501). She experiences pain when moving from a standing to sitting position and was able to sit for forty-five minutes before her back started to ache and her legs became numb. In addition, Plaintiff indicated that she was able to lift a gallon of milk, but was unsure as to whether she could lift a ten pound bag of potatoes (501-02).

**Plaintiff's Medical History**

### Evidence Prior to the Alleged Disability Onset Date of August 12, 2002

Plaintiff received an EMG study of her lower extremities on August 12, 1999, consistent with bilateral changes in the L4-5 distribution. Nerve conduction studies were normal (266-67).

Plaintiff was injured in an automobile accident on March 13, 2000 and was taken to the hospital by an ambulance, but was not admitted (113). She was subsequently treated with medication, physical therapy, and chiropractic intervention (*Id.*). An MRI of plaintiff's left knee taken on April 26, 2000 revealed a complex vertical/oblique tear of the posterior horn medial meniscus (172).

An MRI of Plaintiff's lumbosacral spine performed on May 3, 2000, revealed an exaggerated lumbar lordosis suggesting muscular and/or ligamenous laxity, rotatory scoliosis convex towards the left, bulging disks at L2-L3 and L3-L4; herniation disks L4-L5 towards the right, centrally indenting the thecal sac, and L5-S1 towards the left, centrally indenting the thecal

sac and left S1 nerve root; and narrow neural foramina at levels L3-S1 (173). An undated MRI of plaintiff's cervical spine revealed straightening and reversal of the cervical lordosis and mild levorotatory scoliotic deformity of the cervical spine; a concentric bulging disc at C3-4 which abutted, which did not deform the anterior margin of the spinal cord; and interval appearances of posterior central herniated discs at both 4-5 and C5-5 which effaced part of the anterior portion of the thecal sac, but did not abut or deform the anterior margin of the spinal cord (125.).

An EMG of plaintiff's upper extremities, performed on June 1, 2000, was consistent with left C6-7 nerve root injury but nerve studies were normal (268-69). An MRI of Plaintiff's left shoulder conducted on June 9, 2000, revealed a thickening, irregularity and increased intermediate signal in the distal aspect of the supraspinatous and long head of bicep tendons consistent with split thickness tears or tendinosis and spurs of the lesser and greater tuberosities humeral head (171).

Board certified orthopedist Dr. Ronald M. Krinick examined plaintiff on June 15, 2000 (113-15). Plaintiff was able to remove her clothing, had no difficulty sitting and lying on the examination table and used no abulatory aids (113). The physical examination revealed abnormal range of motion, tenderness and deformity in the left shoulder and knee. Her gait, reflexes, and sensation were normal (114). He recorded an impression of left knee medial meniscus tear, traumatic arthropahy, and partial anterior cruciate ligament tear, left shoulder traumatic bursitis and an impingement of the left shoulder (Id.).

On June 23, 2000, Dr. Krinick operated on Plaintiff's left knee (122-24, 153-55). On June 27, 2000, he indicated that Plaintiff's range of motion, strength, normal sensation, and pain had improved (116). On August 3, 2000, he reported a decrease in strength and range of motion,

5

but indicated that sensation was still normal and plaintiff's overall condition was still improving (117). He concluded that plaintiff was "not restricted and may resume work duties" (*Id.*).

On May 3, 2002, plaintiff tripped on a rug at work and fell, injuring her right knee (118). On May 8, 2002, Dr. Noel Fleischer, a neurologist and plaintiff's treating physician since the early to mid 1990s, examined plaintiff for complaints of severe lower back pain with numbness and tingling in her legs as well as pain in her right knee (126, 129). Dr. Fleisher indicated persistent tenderness in the lumbar spine and right knee, although less than the prior visit (130). Plaintiff was taking Anaprox and Tylenol with Codeine. (*Id.*)

An MRI of the right knee performed on May 21, 2002 revealed minimal joint effusion (133). An MRI of the lumbosacral spine, also conducted on May 21, 2002, revealed L4/5 disc herniation, which impinged upon the thecal sac, and L5/S1 disc herniation, which did not impress upon the thecal sac (134). The MRI also revealed degenerative disease and left renal lesion, possibly representing a cyst (*Id.*).

On May 31, 2002, Dr. Fleischer noted that plaintiff had persistent numbness in the legs (131). His examination findings were unchanged. On June 13, 2002, Dr. Krinick examined plaintiff regarding her new knee injury (118). He noted that she was able to remove her clothing, had no difficulty sitting and lying on the examination table, and used no ambulatory aids. Her gait was slow, guarded, and antalgic, and she was taking Vioxx (*Id.*). At a follow up examination on July 11, 2002, Dr. Krinick noted that plaintiff's condition had not improved (119). Plaintiff had no new complaints and was undergoing physical therapy three times per week. A physical examination revealed decreased strength and range of motion "relative to normal" (*Id.*). Dr. Krinick noted that plaintiff could return to work in a light capacity (120). Plaintiff was discharged from Dr. Krinick's care pending authorization for surgery and was

6

referred to a specialist in physical medicine and rehabilitation for physical therapy and medication (119). Authorization was requested for an arthroscopy of the right knee and for medical menisucus tear, rehabilitation, and rehabilitation post-surgery (*Id.*).

On August 8, 2002, Dr. Krinick noted that plaintiff's condition was not improving and that she had decreased range of motion and strength (121). He reiterated the authorization requests, and indicated that plaintiff could return to work in a light duty capacity.

*Medical Evidence from Plaintiff's Alleged Disability Onset Date of August 12, 2002 to December 31, 2006 (Her last insured date)*

In an August 12, 2002 report, Dr. Fleischer, noted that plaintiff had cervical and lumbar radiculopathy, left knee surgery and right knee sprain (135). Her symptoms were listed as neck and back pain, numbness of both legs and left arm, as well as pain in both knees (*Id.*) Plaintiff was receiving physical therapy and chiropractic treatment for lower back and neck pain (136). Dr. Fleischer assessed that during an eight hour workday, plaintiff could stand/walk less than two hours, sit up to six hours with no limitations pushing/pulling, and was limited to occasionally lifting/carrying ten pounds (138.).

Dr. Fleischer also completed a mental RFC assessment on August 12, 2002 (140-43). In that report, he noted that plaintiff was not significantly limited in most areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. Fleischer reported that plaintiff was moderately limited in the following areas: (1) the ability to maintain attention and concentration for extended periods; (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable

7

number and length of rest periods; (4) the ability to travel in unfamiliar places or use public transportation; and (5) the ability to set realistic goals or make plans independently of others (139-40).

In an August 14, 2002 report, Dr. Richard Weinberg, a chiropractor, noted that he had treated plaintiff three times a week since July 5, 2002 for lower back pain (144). He noted that plaintiff had lumbosacral radiculopathy and recorded her symptoms as severe low back pain radiating down her left leg and leg pain radiating down to her toe (*Id.*). Her lower back pain was described as constant strong pain which became sharp with forward bending, standing up from sitting or lying down positions (*Id.*). Coughing and sneezing caused radicular pain, as did prolonged sitting, standing, and walking (*Id.*). Plaintiff was being treated at another office for her knee pain (*Id.*).

Dr. Weinberg opined that during an eight hour workday, plaintiff was limited to occasionally lifting and/or carrying ten pounds, standing and/or walking less than two hours and sitting less than six hours (147). Dr. Weinberg indicated that plaintiff was limited in pushing/pulling but no amount was specified (*Id.*). Dr. Weinberg stated that the "patient is presently totally disabled" (*Id.*).

On October 9, 2002, Dr. Krinick sent a letter to Dr. Fleischer indicating that he performed arthroscopic surgery to repair plaintiff's medial meniscus (259).

From March 23, 2003 to September 23, 2003, plaintiff was treated for her pain at the Mount Sinai School of Medicine. (273-91).

On March 24, 2003, Dr. Mario Mancheno, a consultative examiner, reported that plaintiff stated she was unable to work due to pain in her cervical spine, lumbosacral spine, knees, left hand and left shoulder (156). Her pain was aggravated by climbing one flight of stairs, pushing,

8

pulling, lifting, and carrying heavy objects and bending frequently (*Id.*). Squatting and sitting for more than two hours caused numbness and cramping, and standing for more than 40 minutes or walking more than five blocks caused cramping and weakness (*Id.*). Plaintiff was taking Tylenol, which afforded partial relief (*Id.*). With regards to daily living, plaintiff reported that she spent most of her time at home and did her own cooking and shopping (*Id.*). She also indicated that she could carry ten pounds (*Id.*).

Dr. Mancheno's physical examination revealed that plaintiff's gait was abnormal in that she limped favoring the right lower extremity due to pain (156). Plaintiff had difficulty heel/toe walking, her neck showed stiffness of right and left paravertebreal muscles, tenderness on motion and palpation for C5 to C7 of the left and right paraspinal areas (*Id.*). Dr. Macheno observed full range of motion of right shoulder, both elbows, and both wrists (*Id.*). Plaintiff's left shoulder showed tenderness of motion and palpation of the anterior, superior, and lateral aspects (157). Plaintiff had full range of motion in her hips, both ankles and both feet. Her right and left knees showed crepitation and tenderness but no swelling, gross instability, or signs of effusion (*Id.*).

An examination of muscle power and tone showed no sign of asymmetry, muscle wasting, or atrophy (157). Strength in all extremities was five out of five, and plaintiff's thoracic-lumbosacral spine showed some tenderness from L2 to S1 in both left and right paraspinal areas. Mild paraspinal muscle guarding was noted (*Id.*). Dr. Mancheno diagnosed plaintiff's condition as discogenic disorder of the lumbosacral and cervical spine, surgery of the knees for removal of torn cartilage and injury of the left shoulder and left hand consistent with possible torn ligaments (158). He opined that the plaintiff's ability to lift/carry, push/pull,

9

stand/walk, and sit were all moderately impaired, that her reflexes were normal, grip and fine manipulation of the hands were not impaired and there was no muscle atrophy (*Id.*).

On March 26, 2003, plaintiff was examined by Dr. JoAnn Thompson at the Mount Sinai School of Medicine Pain Management Service (293-94). Physical examination revealed diffuse paravertebral tenderness to palpation as well as paraspinous spasm bilaterally, right sacroiliac joint tenderness to palpation, and no piriformis tenderness (294). Diagnosis was lower back pain most likely related to herniated discs (*Id.*). Dr. Thompson also noted that plaintiff, as a result, developed myalgias and muscle spasm and that she had bilateral lumbrosacral neuritis (*Id.*). Plaintiff was given a lumbar epidural steroid injection and was advised to continue taking Pamelor (*Id.*). On subsequent visits, plaintiff received additional injections and medications (273-91).

On December 5, 2003, Dr. Fleischer noted that plaintiff was somewhat less depressed than previously (256). She had tenderness of the lumbar spine with impaired range of motion and tenderness in the right knee with impaired range of motion (*Id.*). In addition, Dr. Fleischer indicated a loss of sensation to pin prick predominately in her right thigh and right upper arm and that her gait was moderately antalgic. (*Id.*).

On March 5, 2004, Dr. Fleischer noted that plaintiff had tenderness of the lumbar spine with impaired range of motion, tenderness in her right knee, and loss of sensation to pinprick in right knee, right thigh, and upper arm (*Id.*). In a report dated July 9, 2004, Dr. Fleischer indicated that plaintiff was mildly depressed (258). There was lumbar spasm and impaired range of motion. Plaintiff had loss of sensation to pin prick in thighs bilaterally, and her gait was antalgic. In a report dated October 8, 2004, Dr. Fleischer noted spasms of plaintiff's lumbar spine with impaired range of motion and tenderness and impaired range of motion in her right

10

knee (268). Medications prescribed were Pamelor, Effexor, Neurontin, Ambien, Darvocet, Lidoderm patch, and Vicodin. Dr. Fleischer again referred plaintiff to the pain management clinic at Mount Sinai Hospital (*Id.*).

On September 15, 2005, Dr. Fleischer saw Plaintiff for complaints of chronic back pain with radiation towards the legs bilaterally with chronic right knee pain (174). Medications prescribed were Percocet, Efexor, Wellbutrin, and Ambien and chiropractic treatments and physiotherapy were ongoing. During the physical examination of plaintiff, Dr. Fleischer noted lumbosacral spasm and tenderness as well as impaired range of motion and tenderness in the right knee, decreased sensation to pinprick in the thighs and right upper arm, positive straight left leg raising, and that plaintiff's gait was antalgic (*Id.*).

Dr. Fleischer's reports dated February 17, 2006 and November 3, 2006 both state that examinations revealed that plaintiff had lumbosacral tenderness and impaired range of motion, diminished pinprick sensation in her thighs and upper arms, positive straight leg raising, and her gait was antalgic (186-87). The November 3, 2006 report also indicated that plaintiff's medications were Percocet, Ambien, Motrin, and Wellbutrin (186).

**Medical Evidence from After December 31, 2006 (Plaintiff's last insured date)**

In a report dated June 15, 2007, Dr. Fleischer indicated that plaintiff's medications were Ambien, Cymbalta, and Percocet (185). During the physical examination, plaintiff was noted to be awake and alert (*Id.*). She had lumbar tenderness and impaired range of motion and tenderness and swelling with the right knee with impaired flexion (*Id.*). Plaintiff had pinprick sensation loss in both thighs (*Id.*). Her gait was antalgic, toes were down, and plaintiff had weakness in the tibialis anterii muscles (*Id.*).

11

In a letter dated January 4, 2008, Dr. Fleischer noted that plaintiff was status post right knee surgery with chronic back pain secondary to disc herniations at L4-L5 and L5-S1 (271). Dr. Fleisher conducted nerve and EMG studies and reported that the results were somewhat worse than the 1999 results (*Id.*).

***Testimony of Dr. Noel Fleischer***

At the December 13, 2007 hearing, Dr. Fleischer testified that he was a board-certified neurologist who had been plaintiff's treating physician since the mid to early 1990s (395-96). Dr. Fleischer testified that he conducted an exam on May 8, 2002, finding cervical and lumbar tenderness and impaired range of motion of approximately 20 to 30 percent in the cervical spine extension and rotations and 45 percent reduction in the lumbar spine (398-99), findings which were not in Dr. Fleischer's report (129). Dr. Fleischer further stated that plaintiff had undergone physical therapy and surgery on her right knee for a torn menisucus, and that she was referred to a pain management specialist who put her on methadone (400-01).

Dr. Fleischer testified that plaintiff was currently on a regimen of Percocet, Motrin, Ambien, and Cymbalta, an anti-depressant/pain medication (401-02). Plaintiff's abilities to sit, stand, and walk were limited, and his opinion rendered at the hearing was based on what plaintiff told him and on his observations (403-4).

Dr. Fleischer testified that he performed EMG studies in 1999 and 2000, revealing that plaintiff had radiculopathy. The reports were not in the record and he did not have them at the time of the hearing (410-418), however, Dr. Fleischer stated that he believed that they showed left C6-7 and L5 radiculopathy. He stated that, regarding his opinion of a restricted range of motion, he would "testify under oath that when [he says] restricted, [he] can back it up over the years that [he's] evaluated thus with a gonimeter [phonetic] and actually measured them" (414).

12

**Testimony of Dr. Donald Goldman**

Dr. Donald Goldman, a board-certified orthopedist, also testified at the December 13, 2007 hearing as a medical expert (404-57), although he never saw the plaintiff or treated her himself. After reviewing the evidence then in the record, Dr. Goldman testified that there was not enough documentation to justify an orthopedic surgical impairment that would lead to disability (434). Dr. Goldman stated that from a clinical point of view, plaintiff had a long history of low back pain and some diagnostic testing indicated that she had a herniated disk; however, Dr. Goldman saw nothing that plaintiff was unable to function due to the herniated disks (*Id.*). He testified that her condition did not meet the Listing of Impairments (435).

Dr. Goldman expressed concern at the lack of documentation of reflex change, atrophy, or weakness (422), however, Dr. Fleischer testified to weakness at the hearing and pointed out documentation (422-23). Dr. Goldman further expressed concern regarding gait abnormalities due to the fact that the medication plaintiff was on for back problems should have, in his opinion, cured the issues (*Id.*). Dr. Goldman noted that, based on the MRI of the spine conducted on May 21, 2002, plaintiff would have some limitations (444). More specifically he indicated that, during an eight-hour workday, plaintiff would be able to lift and bend for four hours, sit for at least six hours, stand and walk at least four hours, and lift and carry objects, although not for the whole day (446). In addition, she should avoid kneeling, squatting, stooping, and climbing stairs (448). Additionally, Dr. Goldman expressed concern about a mass seen near plaintiff's kidney on the MRI, since plaintiff was on so many types of medications (408).

13

***Testimony of Dr. Warren Elliott Cohen***

Dr. Cohen, a neurologist, also testified as an expert during the December 13, 2007 hearing (458-84), although he never saw the plaintiff or treated her himself. Dr. Cohen stated that the records indicated that plaintiff had discogenic disease of the lumbar spine and internal derangement of both knees which, both alone and in combination, did not meet or equal the Listing of Impairments (460-61). He opined that plaintiff could, during an eight hour workday, stand/walk at least two hours, sit for six hours, and would be limited to kneeling, crouching, and crawling occasionally (461-462). Plaintiff was limited to occasionally lift/carry twenty pounds and frequently lift/carry ten pounds (461). Dr. Cohen stated that he did not see anything in the record that showed plaintiff's medications affected her cognitive functions, but that the record reflected chronic pain (462-63). Upon being asked what is the likelihood of the results of an EMG performed in 1999 or 2000 remaining unchanged, Dr. Cohen testified that an EMG finding is not the only criteria used to determine whether an individual has radiculopathy, rather there must be a significant loss of functional capacity as shown by persistent weakness, reflex loss, ability to sit and impairment of gait (472-73). However, Dr. Cohen subsequently stated that if he had the results of an EMG study, and that study showed radiculopathy, it would change his opinion (473-73). Dr. Cohen indicated that the record does not show impairment of functional abilities on a regular basis nor to the extent where one would expect the result would be radiculopathy (*Id.*).

***Plaintiff's Application for Disability Insurance Benefits***

On November 12, 2002, plaintiff filed her application for benefits, alleging that she had been unable to work since August 12, 2002 based on lower back, right and left knee, and neck pain (48-51). As part of her application, plaintiff completed an Adult Disability Report dated

November 8, 2002, in which she stated that she was in constant pain in her back, knees, and neck, and that she felt useless because she "can't do anything" (75). Plaintiff stated that she stopped work because "the pain was horrible" (*Id.*). In a Work History Report dated November 8, 2002, Plaintiff reported that during an eight hour workday, she would walk for four to five hours, stand for one to two hours, sit for four to five hours, kneel for one to two hours, crouch for one to two hours, climb up to one hour and write/type/handle for eight hours (87). She further indicated that she would occasionally and frequently lift less than ten pounds (*Id.*).

In an Adult Function Report, dated November 8, 2002, Plaintiff indicated that she was living with her family (94). Plaintiff reported that during the day, she would spend a majority of her time lying on either the couch or the bed, prepare food once a day for two hours, go shopping once a month for one hour, and go to church once a month and visit friends once a week (95-97). Plaintiff indicated that she had difficulty sleeping, getting dressed, lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching, and bending (95-99). While medication alleviated her pain, it would either make her drowsy or upset her stomach (103). As a result, plaintiff would take hot showers, sleep with a heating pad, and attend physical therapy (*Id.*).

In an Adult Disability Report dated February 6, 2003, plaintiff indicated that during an eight hour workday as a personal finance representative, she would walk for five hours, stand for two hours, sit for five hours, climb for one hour, stoop for three hours, kneel for two hours, crouch for two hours, reach for one hour, and write/type/handle small objects for eight hours (68-9). Plaintiff testified that from 2002-2006, she suffered from constant pain and was put on various medications including Vioxx, Celebrex, Motrin, and Methadone(488-89). The Methadone caused her to vomit, feel nauseous, and to suffer itching and dry mouth (491). From 2002-2006, plaintiff rested for the whole day, "lying down like a vegetable." (493).

15

*The Legal Standard for Disability Determination*

Under 42 U.S.C. §423(a)(1), any person who has not yet attained retirement age and who files the requisite application is entitled to DIB if he or she is insured for disability insurance benefits, as determined under 42 U.S.C. §423(c)(1), and is "disabled." The term "disabled" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). However, the statute itself provides that for purposes of §423(d)(1)(A):

> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . [and]

> (B) In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. §423(d)(2).

The Social Security Regulations require that, in deciding whether a claimant is disabled, SSA personnel use the "five-step sequential evaluation process" delineated in 20 C.F.R. §404.1520(a). Under this five-step framework, the SSA must first consider the claimant's work

16

activity. If the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings. 20 C.F.R. §§404.1520(a)(4)(i), 404.1520(b). Otherwise, the SSA next considers the "medical severity" of the claimant's impairment. 20 C.F.R. §404.1520(a)(4)(ii). If the claimant does not have "any impairment or combination of impairments which significantly limit [his or her] physical or mental ability to do basic work activities," the claimant does not have a severe impairment and, therefore, is not disabled. 20 C.F.R. §404.1520(c).

In the third step, the SSA further considers the medical severity of the impairment by comparing the claimant's impairments to those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant has an impairment which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is disabled. 20 C.F.R. §404.1520(d). If not, the SSA must proceed to the fourth step and assess the claimant's "residual functional capacity" to do his or her "past relevant work." 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can still do his or her "past relevant work," the claimant is not disabled. *Id.* However, even if the claimant can no longer perform the past relevant work, the claimant is not disabled if he or she "can make an adjustment to other work." 20 C.F.R. §404.1520(a)(4)(v). The Social Security Administration bears the burden of proof only with respect to this fifth step. The claimant bears the burden with respect to the other four steps. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

### *The ALJ's Decision*

In this case, there was no question that plaintiff had filed the requisite application and had not attained retirement age. Accordingly, ALJ Strauss engaged in the five-step analysis dictated by 20 C.F.R. §404.1520(a) in order to determine whether plaintiff was disabled.

First, the ALJ determined that plaintiff had not engaged in substantial gainful employment since August 12, 2002, the alleged onset date (17). Second, the ALJ determined that plaintiff had the following severe impairments: lumbar discogenic disc disease and bilateral knee derangements that have been surgically treated (*Id.*). Third, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Apprendix 1 (*Id.*).

In step four of the five-part analysis, the ALJ analyzed plaintiff's RFC by considering reports from her treating physicians, consultative examiners, and the non-examining medical consultants, and plaintiff's subjective allegations concerning pain and her functional abilities (Id.). The ALJ determined that plaintiff could sit for six hours, stand/walk for four hours, lift five to ten pounds frequently and eleven to fifteen pounds occasionally and that she should avoid kneeling, stooping, squatting, and climbing stairs (*Id.*). The ALJ then concluded, based on ALJ testimony, that plaintiff was able to perform her past relevant work as a customer service representative (31). Since the ALJ determined that plaintiff was able to perform her past relevant work, the ALJ did not reach the fifth step to determine whether or not the plaintiff could perform other jobs (*Id.*).

Plaintiff promptly requested a hearing to review of ALJ Strauss's decision, and on April 15, 2009, the Appeals Council denied Plaintiff's request, making ALJ Strauss's July 24, 2008 decision the final decision of the Commissioner (7-9). Plaintiff commenced this action on May 12, 2009, alleging that the ALJ's decision "was not supported by the record and should be reversed." Plaintiff's Cross Motion for Judgment on the Pleadings ("Pl.'s Motion") at 17.

The parties now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. To the extent that they are relevant to the resolution of this matter, the parties arguments are summarized in the discussion below.

## DISCUSSION

### I. Scope of Review

"The scope of review of a disability determination under 42 U.S.C. § 423(a)(1) . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 983 (2d Cir. 1987) (citing cases). First, a court must decide whether the Commissioner "applied the correct legal principles in making the determination." *Id.* Second, a court must decide "whether the determination is supported by 'substantial evidence.'" *Id.* (citing 42 U.S.C. § 405(g) (1982)).

#### A. Legal Principles

As this Court noted previously, the determination of whether plaintiff was entitled to DIB in this case turns on the question of whether or not she was disabled. In deciding whether plaintiff was disabled, the Commissioner is required by the Social Security regulations to use the five-step process set forth in 20 C.F.R. §404.1520(a). *See* pp. 17-18, *ante*. However, the Social Security regulations also dictate what evidence the Commissioner must consider, and the manner in which the Commissioner must evaluate the evidence.

First, the regulations require that, under some circumstances, deference be given to the opinions of those physicians who have personally treated social security claimants. The "treating physician rule" provides that a treating source's opinion regarding the nature and severity of a claimant's impairments that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in the

record should be given controlling weight. 20 C.F.R. § 404.1527(d)(2). However, the "opinions of a treating physician . . . need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino*, 312 F.3d at 588 (citations omitted). The less consistent an opinion is with the record as a whole, the less weight it will be given. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

An ALJ is "free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions." *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) (quoting *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir.1978)). Yet, an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008) (*Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)). For that matter, an ALJ cannot set his own expertise against that of any physician who submitted an opinion to or testified before him or her. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998).

If an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for doing so. 20 C.F.R. §404.1527(d)(2). In determining what weight to give to the treating physician's opinion, the ALJ is required to apply the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating source's opinion is with the record as a whole; (5) the specialization of the source in contrast to the condition being treated; and (6) any other significant factors. *See id.* After considering the above factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

Before an ALJ can weigh these factors, however, the ALJ must develop the record. *Burgess v. Astrue*, 537 F.3d at 129 (2d Cir. 2008). Indeed, an "ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." *Shaw*, 221 F.3d at 131. "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Burgess*, 537 F.3d at 129 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). "[W]here . . . an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she may not reject the opinion as unsupported by objective medical evidence without taking affirmative steps to develop the record in this regard." *Rivas v. Barnhart*, No. 01 Civ. 3672 (RWS), 2005 WL 183139, at *23 (S.D.N.Y. Jan. 27, 2005).

In determining the claimant's residual functional capacity, an ALJ is required to take into account a claimant's assertions of pain and other limitations. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The SSA regulations establish the following two-step process for evaluating these assertions:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. §404.1529(b). That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id.* The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in

21

testimony in [its] administrative proceedings." 20 C.F.R.
§404.1512(b)(3); *see also* 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

*Id.* (emphasis in original).

"It is well settled that 'a claimant's subjective evidence of pain is entitled to great weight' where . . . it is supported by objective medical evidence." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). Where an ALJ rejects subjective testimony concerning pain, the ALJ "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y. 1987). "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ must consider *inter alia*: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain or symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side-effects of medication taken to alleviate the pain or other symptoms; (5) any treatments, other than medication, for relief of pain or other symptoms; and (6) any other measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

## B. *Substantial Evidence*

If the Commissioner applied the correct legal principles, a court reviewing a disability determination under 42 U.S.C. § 423(a)(1) must decide whether the Commissioner's determination was supported by "substantial evidence." *Johnson*, 817 F.2d at 985. This action is brought pursuant to 42 U.S.C. § 1383(c)(3), which provides that the final determination of the Commissioner of Social Security after a hearing to determine eligibility for benefits is subject to judicial review as provided in 42 U.S.C. § 405(g). Section 405(g) permits "[a]ny individual,

after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . [to] obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . in the district court of the United States for the judicial district in which the plaintiff resides . . . ." Upon this review, this district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Section 405(g) expressly provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then the decision must be affirmed. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.") "Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

"In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991); *see also Veino*, 312 F.3d at 586 ("The district court's review of the Commissioner's decision regarding [the existence of a] disability is limited to a

23

determination of whether the decision is supported by 'substantial evidence' in the record as a whole."). The "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("This deferential ["substantial evidence"] standard of review is inapplicable . . . to the Secretary's conclusions of law" and "[f]ailure to apply the correct legal standards is grounds for reversal.").

### III. *Plaintiff's Arguments*

In moving for judgment on the pleadings in this case, plaintiff argues that the ALJ's decision was not supported by factual evidence. First, plaintiff argues that "although finding that plaintiff was not disabled, ALJ Strauss acknowledged that, at the least, plaintiff suffered from the severe impairment of lumbar discogenic disc disease." Pl.'s Motion at 13. Second, plaintiff argues that "the ALJ determined that plaintiff had no medically determinable mental impairment, even though she acknowledges that plaintiff had three months of psychiatric treatment." *Id.* Third, plaintiff claims that the ALJ relies primarily on the oral testimony of Drs. Goldman and Cohen, who never examined plaintiff, which ignoring the testimony of the treating physicians. *Id.* Plaintiff further argues that the "ALJ's failure to rely on the testimony of treating physicians is a particular problem in light of the findings by medical expert, Dr. Lombardi that his view could be nothing more than a 'snapshot.'" Plaintiff claims that the ALJ failed to establish proper grounds for applying the treating physicians rule. Plaintiff additionally argues that the ALJ erred in dismissing the reports of Dr. Weinberg, plaintiff's chiropractor. Fourth, plaintiff claims that the ALJ failed to properly consider evidence regarding plaintiff's pain and inability to work. Fifth, plaintiff argues that the ALJ incorrectly evaluated plaintiff's ability to work.

24

**A. Plaintiff's Impairments**

Plaintiff's argument that although the ALJ found severe impairments she failed to find plaintiff disabled is unavailing. The existence of severe impairments, without more does not serve as the basis of eligibility. Section 20 C.F.R. Sec. 404, 1504(a) provides that an individual shall be determined to be under a disability only if the physical or mental impairment are of such severity that he is unable to perform previous work. Therefore, the ALJ is permitted to categorize plaintiff's lumbar discogenic disc disease as a severe impairment while still finding plaintiff able to perform past work, if the ALJ has properly addressed the record, which the Court will address in the next section.

**B. Treating Physician's Rule**

With respect to plaintiff's second and third argument, this Court agrees with plaintiff that the ALJ failed to properly apply the "treating physician rule." To the extent that there was evidence in the record contradicting Dr. Fleischer''s opinion, ALJ Strauss was not required to give Dr. Fleisher's opinion controlling weight. *See Veino*, 312 F.3d at 588.
However, the ALJ was nonetheless required to consider the factors listed in 20 C.F.R. § 404.1527(d)(2), including (1) the fact that Dr. Fleischer had been treating plaintiff generally since the early to mid 1990s and on a regular basis for over five years at the time he wrote his December 17, 2007, letter; (2) that he was her treating physician; (3) that at least some aspects of his opinion were supported by considerable objective medical evidence; (4) that this medical evidence was largely consistent with Dr. Fleischer's opinion; and (5) that Dr. Fleischer was a board certified neurologist. After considering these factors, the ALJ should have comprehensively set forth her reasons assigning little or no weight to Dr. Fleischer's opinions. *See Halloran*, 362 F.3d at 33.

In analyzing only some of the above factors, the ALJ chose to give less weight to Dr. Fleischer's opinion because, "although he is a treating physician, . . . he has not always documented specific findings on examinations which were quantified to support functional limitations." Moreover, the ALJ found that "his limitations were inconsistent with the opinion of claimant's treating orthopedic surgeon Dr. Krinick that claimant could perform light duty work" (31). *See Halloran*, 362 F.3d at 33.

Despite the fact that Dr. Fleischer did provide the ALJ with several reports dated December 5, 2003, march 5, 2004, and July 9, 2004, which were admitted into evidence at the hearing, the ALJ seems to discount Dr. Fleischer's findings because he has not provided documentary evidence for every single quantifiable finding during his examinations. Moreover, the ALJ noted that there were no records in evidence of EMG test results, even though Dr. Fleischer testified that plaintiff had undergone at least two undocumented EMG tests in the past, one of which examined the lower extremities and showed L5 radiculopathy. The ALJ failed to develop the record with regard to the missing EMG results, which she found to be a contributing factor to her decision that Dr. Fleischer's opinion should be given no weight due to his "not always document[ing] specific findings." Despite finding undocumented specific findings, the ALJ fails to identify missing findings and to explain how those missing findings outweigh the existence of evidence provided by Dr. Fleischer, such as his findings in his reports constituting hearing exhibits 15F, 16F, and 17F. Additionally, Dr. Fleischer's letter of December 18, 2007 explains some of the limitations in the record, however, the ALJ fails to acknowledge those explanations in her decision (263-64). Finally, the ALJ fails to acknowledge the verbal testimony of Dr. Fleischer, in which he attempted to fill in gaps in documentation (414-417).

26

Furthermore, the ALJ fails to address all of the six factors listed in 20 C.F.R. §
404.1527(d)(2) deciding to give Dr. Fleischer's opinion with regard to plaintiff's physical
impairments no weight. Instead, the ALJ only addresses factors 2 and 4. With regard to the
plaintiff's mental capacity assessment, the ALJ chose to give Dr. Fleischer's opinion no weight
because "he is not a psychologist or a psychiatrist and lacks the qualifications necessary to
render an informed an authoritative opinion," however, the ALJ again fails to examine the
remaining factors in 20 C.F.R. § 404.1527(d)(2).

Additionally, this Court is troubled by the ALJ's adversarial approach at the December
13, 2007 hearing and reminds the ALJ that the hearing is not adversarial in nature. *Perez v.
Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("[A] hearing on disability benefits is a non-adversarial
proceeding..."). A review of the transcript reveals a disturbing pattern of interruption and
testimony by the ALJ, which goes so far as to result in expert Dr. Goldman changing his
testimony after aggressive persuasion by the ALJ. For example, Dr. Goldman testifies, "I can
only imagine, based on the MRI of the spine, that she would have some limitations on at least a
time issue of probably four to six hours a day, as long as it didn't require a constant bending or
twisting." (444). After additional questioning, ALJ Strauss asks, "Could she work an eight-hour
day? She has to be able to – ." Dr. Goldman then changes his answer to affirm that Plaintiff is
able to work an eight-hour day, at which point the ALJ is satisfied and moves to another line of
questioning. (444-45). Subsequently, the ALJ persuades Dr. Goldman to change his evaluation
that Plaintiff had the ability to lift weight from 10 to 15 lbs for less than a full day to her having
the ability to lift that amount of weight for an eight-hour day with regular breaks. (446-47).
Moreover, ALJ Strauss then misstates this testimony in her July 24, 2008 report, claiming that
Dr. Goldman opined that the claimant could "lift/carry fifteen pounds occasionally and ten to

fifteen pounds frequently." (30). This interpretation of Dr. Goldman's testimony blatantly mischaracterizes his evaluation of plaintiff's capabilities.

At other times, it is apparent that Dr. Goldman lacked access to the full record in formulating his residual functional capacity assessment. On several occasions, the ALJ read portions of documentation to Dr. Goldman (417-19), and on at least one occasion Dr. Goldman specifically stated that he had no records regarding plaintiff's psychiatric care (444). In response, ALJ Strauss directed Dr. Goldman to answer questions "based on the records, only on the records you have." (*Id.*) Thus, Dr. Goldman's opinion was not based on the full record available, including the hearing testimony of Dr. Fleischer.

In addition to this inappropriate extraction of testimony in contravention to the witness's initial statements, the ALJ approached the hearing as an adversarial proceeding, interrupting Plaintiff's witnesses and refusing to accept their testimony. For instance, the ALJ refused to accept Dr. Fleischer's testimony regarding an EMG showing radiculopahy, saying "I"m not going to go there. I either want the exact report – there was not one made." (467). In another instance, ALJ Strauss appears to ignore or refuse to accept Dr. Fleischer's testimony regarding weakness in Plaintiff's legs. (421-22). Perhaps even more egregious, ALJ Strauss also testifies for Plaintiff at times. For example, the ALJ states that Plaintiff "said she doesn't remember" when she went back to work in 2004, in the face of Plaintiff's attorney's statements that Plaintiff did indeed remember and was able to testify to such. (432).

This adversarial approach has no place in a hearing to determine Social Security disability, and a review of the transcript reveals that the ALJ's conduct prevented witnesses from testifying fully. *Perez*, 77 F.3d at 47. The Court remands the instant action to the ALJ to further develop the record regarding the missing pieces of information she finds essential to her decision

and to address every factor in 20 C.F.R. § 404.1527(d)(2) with regard to her decision to give Dr. Fleischer's opinion of plaintiff's physical and mental impairments no weight. The case is also remanded for further development of the testimony of Dr. Fleischer, who was unable to testify fully due to the ALJ's interruption and insertion of her own testimony. Additionally, the Commissioner is instructed to direct Dr. Goldman, or another state agency medical consultant, to review and address all of the information in record in formulating his or her revised Residual Functional Capacity Assessment. During remand, the ALJ will conduct a non-adversarial hearing and allow the treating physician to testify under oath to information that is not obtainable through documentation.

## C. Testimony of Dr. Weinberg

ALJ Strauss declined to give Dr. Weinberg's opinion any weight, finding that "a chiropractor is not an acceptable medical source." (24). The Court acknowledges that a chiropractor's findings are not entitled to the weight of a physician's findings. *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995). However, the ALJ is instructed to review Dr. Weinberg's specific findings in light the testimony on remand.

## D. Plaintiff's Testimony

The Court is also troubled by the ALJ's determination that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (20). However, Plaintiff's claims are consistent with the assessment of at least some of the testifying witnesses, and the ALJ failed to further explain why she found Plaintiff's claims incredible. Furthermore, there is no indication that the ALJ considered Plaintiff's work history in making this finding, even though "[a] claimant with a good work

record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983). On remand, the ALJ shall explain her evaluation of plaintiff's credibility and take into consideration her work history.

Because remand is necessary for the reasons stated in the preceding section, this Court need not address plaintiff's remaining arguments at any length.

### *Conclusion*

For the reasons set forth above, the Court remands the instant action to the ALJ to further develop the record regarding the missing pieces of information she finds essential to her decision and to address every factor in 20 C.F.R. § 404.1527(d)(2) with regard to her decision to give Dr. Fleischer's opinion of plaintiff's physical and mental impairments no weight. The case is also remanded for further development of the testimony of Dr. Fleischer, who was unable to testify fully due to the ALJ's interruption and insertion of her own testimony. Additionally, the Commissioner is instructed to direct Dr. Goldman, or another state agency medical consultant, to review and address all of the information in record in formulating his or her revised Residual Functional Capacity Assessment. The Commissioner is also instructed to review the observations of Dr. Weinberg in light of the revised assessment. Finally, ALJ shall explain her evaluation of plaintiff's credibility and take into consideration her work history. During remand, the ALJ will conduct a non-adversarial hearing and allow the treating physician to testify under oath to information that is not obtainable through documentation.

**SO ORDERED.**

SANDRA L. TOWNES
United States District Judge

Dated: September / , 2011
      Brooklyn, New York